Good morning, Mr. Angstrich. Thank you, Your Honor. My name is Scott Angstrich. I represent Verizon Business, and I'd like to reserve three minutes of my time for what we are likely to go beyond the 15 minutes allotted here. Obviously, there are a lot of very complicated issues, and, you know, whether the CLECs can include the tandem switch fees in either the direct or indirect context is obviously quite complicated here. That is where they don't operate the tandem switches themselves. We're concerned about a number of matters. Certainly, it seems to us that there's contradictory interpretations by the FCC and New South and the Quest decisions. We're also aware that, from last winter, the FCC has embarked on a new program that seems to address or will address the very issues we have in front of us here. Besides the quite specific issues, there are some general overall issues we'd like you to address as well, including primary jurisdiction. Absolutely, Your Honor. If I can start with the apparent, what I would call the surface tension between some of the earlier paragraphs in the order and the paragraphs that we think are dispositive, paragraphs 20 and 21 of the 8th Report and Order. I think the answer, Your Honor, to the surface tension is found in paragraphs 19 and 20 of the 8th Report and Order. Paragraph 19, move this a little closer. I don't think the mic's working. Are we recording? Excuse me, say this at that ounce. There, just a little. I want to make sure we're recording because this hates us later on. I appreciate that, Your Honor. Paragraphs 19 and 20 is really where the action is in terms of understanding what the FCC was doing. Focus first on the last sentence of paragraph 19 and the first sentence of paragraph 20. These are found at pages 252 and 252 has the two sentences, 251 has the rest of paragraph 19. At the end of paragraph 19, the FCC says, Therefore, we find no reason why the Commission is prevented from clarifying the application of the transition benchmark rates or amending its rules prospectively as set forth above. As we understand that sentence, the Commission is saying, as set forth above, that is, in the preceding paragraphs, we did two things. We clarified the application of our transition benchmark rates and we adopted a new prospective rule to address a scenario that we had not previously addressed and that is not protected in this case. That's where a competitor is not sending traffic calls to its own customers, people who pick up the phone, but is sending calls to another telecommunications carrier, wireless carrier, or another local telephone company. Just for clarification, because this is a very complicated case for me, the paragraph 19 that you just recited from, was that as to the Q. West petition? That comes at the end of, so the Commission starts discussing the Quest petition in paragraph 10. So for paragraphs 10 through 18, it engages in a discussion about the Quest petition and this problem that arose after the 2001 order, where some competitors were inserting themselves into the call path, doing a very small amount of work, and then claiming that they were entitled to the entire transition rate, which at the time, early on, was still quite high, 2.5 cents a minute, rather than down to 1.8 and 1.2, and there was a lot of litigation over that issue. I understand that, but do I understand your argument to be, at least in part, with respect to paragraph 19 in the eighth report, that the Quest ruling applies only to transitional benchmark rates? Yes. But doesn't that paragraph elsewhere say specifically that the rule applies to the transitional rate in addition to the final rate? It doesn't, Your Honor. The sentence is, the arguments presented by Quest to support its request are equally applicable to the transitional benchmark. And you have to understand why the FCC is saying that. U.S. LEC, which is now part of PAPAC and is one of the plaintiffs here, has said to the FCC in the next part of the filing, it's not in the Joint Appendix, although it's cited in the order we've got a copy of right here, said to the FCC, we understand you're thinking about changing or clarifying the transition regime. You don't have authority under the Administrative Procedure Act to do that, because, one, the time for doing it under all authority has long since expired. There's a rule that says if the FCC wants to clarify it under all its own authority, it has to do it in 30 days. And two, Quest's petition doesn't give you that authority because it doesn't talk about the transition regime. So paragraph 19 is the FCC explaining why U.S. LEC is wrong, why Quest's petition gives it the authority to clarify the transition rules. And it says there's two reasons why. One, we think Quest's petition itself has arguments that are applicable to the transition regime, and that's enough to give us authority. Earlier in the footnote, this is footnote 65, they say even if you're wrong about that, even if U.S. LEC is right and Quest's petition doesn't give us this authority, changing and clarifying the transition regime is a logical outgrowth of the petition. So all of paragraph 19 preceding that final sentence, you know, when it starts, right, the paragraph it starts by, we reject the argument that we can't change the transition regime, and it ends by saying what we did above was clarify the transition regime. And in between it says, U.S. LEC, you said we have no administrative authority to do this, and you are wrong. Can I take you back to paragraph 15? Sure. Which I think, I'm thinking this being Quest's answer, and I'm finding it confusing. That the benchmark rate is available only when a competitive LEC provides an IXC with access to the competitive LEC's own end users. As explained earlier, a competitive LEC that provides access to its own end users is providing the functional equivalent of the services associated with the rate elements listed, and therefore is entitled to the full benchmark rate. Well, it is not really, it is not providing the service. It is providing the functional equivalent. Right, that's in the indirect situation. Why, why, The issue of course is that they're always providing the functional equivalent in both situations. Why are they not? Why are they not providing the functional equivalent in the direct situation? Because, you know, I think it would have been open to the FCC to say, we're going to adopt the same rule for local traffic that this court dealt with in the SBC decision as long distance, that no matter how much specific work you competitor do, we're going to treat you as providing the functional equivalent. And in dealing with the New South request in paragraph 21, we reject that approach. So you're right. Where specifically? They don't reject it within those terms, though. Well, they do. They say in paragraph 20 that New South argues that it should be allowed to charge all of the competing ILEC elements. So every element, all the, Including TANF switching. Including TANF switching. If it's switched to a geographic area, And it footnotes to that's just like the local traffic rule. And this, of course, was exactly the same argument that Paycheck Waste and the district court and the district court properly rejected. And then it goes on to say, we're not going to do that. We're going to tell competitors that they're subject to the same rule that applies to incompetence. What is New South seeking? New South is seeking a clarification that after the transition ended, The transition rate, this full benchmark, was literally a number. It was a number set nationwide without regard to any particular competing incompetence tariffs or tariff rates, Without regard to the work a competitor was doing. It was a transitional, slow step down for competitors that had been charging much, much higher rates. So the notion that you wouldn't pull that apart and pull out individual rate elements from a number that was never set with regard to them, Isn't all that surprising. But once the transition is over, here's where you get to what New South is asking. New South is saying this. As long as my one switch... Well, not what they're saying. And aren't I correct that New South was not seeking before the commission to charge for services that were provided by another LAC? Of course it wasn't, Your Honor. New South said, if I have one switch, and I serve my end user, I should be able to charge, and it's right in their counter to 20, All, every single one of the competing incumbent LAC switching elements. Right in the middle of the pattern. They wanted the right... In lieu of the benchmark. No, that was the benchmark. The benchmark is... We talk about it as a benchmark, it's really a ceiling. What the regulation says, and this is 6126.85, It says... Sorry, B. B says you can't tariff. That is all I have after the transition is over, of course. You can't tariff at a rate that exceeds the rate of the competing incumbent. And then the regulation defines rate. And it defines rate as the sum of the applicable incumbent elements. So to figure out what the benchmark is in any part of the country, You've got to figure out who the incumbent is, you've got to go get their tariff. Then you figure out what the applicable rate elements are, and then you add them up. And that's a ceiling. And then the competitor, as long as the competitor is charging long distance carriers less than that number, Whether they're charging one big bundle in one number, Or they're charging across a series of separate numbers, They're doing it right. But that's what the fight is here. The dispute here is about which rate elements are applicable. Which rate elements, because they're applicable, Go into calculating that ceiling, that maximum they can put in their tariff, Which we call the benchmark. But again, the benchmark is just the sum of a bunch of numbers in an incumbent's tariff. But why would they reject the functional equivalent? Why do they reject the functional equivalent application in connection with the direct connection? They reject it. But we have this discussion in the New South Paragraphs, It's not just about direct connection. And you know that because we look at Paragraph 21, Where they stress, and this is the penultimate sentence, Competitive WECs also have, and always have, The ability to charge for common transport when they provide it. And transport is just taking calls between one switch and another. Including, not only... But is the emphasis there on provide and not on they? No, but I don't kind of... I think the emphasis is on when. Including when they subtend an incumbent. When you subtend, you are receiving calls from an incumbent like Tim, And that's what subtending means. So what they're saying here, and of course the diagram New South drew, Of the arrangement that it described as typical, Showed an indirect interconnection. So the commission here understands, And it leads to this in footnote 68 as well, The commission understands that this is about not just direct. And then the district court was wrong. Pageant concedes it's legally incorrect. Nobody defends the distinction the district court drew, And for good reason. But so, we do think that the FCC pivots in Paragraph 19, Where it says, above, we did two things. We clarified the transition regime, And we adopted this in Rule 61.26f. And then they say, finally. Finally, we're going to do something different. We're going to clarify the competing ILEC rate, As it applies after the transition ends. And they say what that means. And what that means is that if you use one switch, There's only one applicable switching rate That can go into calculating the ceiling. And then in 2008, they say it again. When Cox comes in and says, well, sometimes we use two switches. And the guy says, well, if you do, Then your ceiling will include two switching rates. But they don't say, as Paytech would have you believe, Well, Cox, just so you know, If you decide to just charge an aggregated or a composite rate, You can throw the second switch and put it in there, No matter whether you use a second switch or not. There's nothing like that. And then just... It offered an option to avoid that charge. Exactly. Which you couldn't do if Paytech were right. Because you could always just charge both. I don't think they had that done in Europe. But then just in November of last year, And if I could use this to switch to the second question, You started with, Your Honor. They again say, The Commission's historical approach Is that when relying on tariff, RECs have been permitted to charge access charges To the extent they are providing the functions. And what are they footing up to? Paragraph 21. Paragraph 21 says the operative law in the post-transition regime. Maybe you're right, Your Honor. Assuming there's 15 or so petitions for reconsolidating The Tenth Circuit of this order right now. But assuming what the FCC did stands, The FCC is in the process of gradually, over time, Ramping down access charges to what would disappear. And so, over time, Disputes like this will also be less relevant Because if the rates are zero, it doesn't matter how many zeros you add up. Together, you're still not charging. But this is a dispute about the past. This is a dispute about Paytech Having decided in 2006 To take its individual elements And first to add them all up into composite rates Which were just the sum of what they'd always been billing for us in business. And then a month later, to sneak in a second rate, a tandem rate, And to increase the rates in Pennsylvania, In the Verizon Pennsylvania Territory, By 30% or 51% depending. And to claim new title. And UMC says you can't do that. So are you saying that the National Broadband Plan Is not going to affect this at all? The National Broadband Plan is not actually a rule. Or an order of any kind. But will it lead? So it's going to lead to rulings. Well, I guess some of the rules that lead to is this. Is this order from November of 2011. And that order will, Again, if it's affirmed and not modified on reconsideration, Will, over time, Zero out access charges. Which will, of course, mean that it won't matter How many switches are being used and how many rates. This dispute will, under the rules adopted, Eventually disappear. But this particular dispute goes back to a period Before this new regime took effect. Even the slow ramp down started it. And so, while there may be a limited instance For other companies to take advantage of What Payday is doing, This is a different dispute. It's one of the things we're trying to figure out. How specific are these disputes to This matter that's before us right now. And obviously it's going to affect some others. But how long will this continue? What will be the import of any decision we render here? I think there is potential import. As of December 29th of last year, The switched access rates have been capped. So, nobody is allowed to come in and file a tariff That increases their switched access rates. But a lot of competitors Currently have element-by-element billing. And I think if this court were either to rule That, as this court did, As long as two switches are used, It doesn't matter who owns them. A competitor can charge two switching rates. You would see a lot of those companies Just starting to add to their bills. They don't have to amend their tax reform They don't have to raise their rates. They just have to change the way they bill. And certainly this court suggested That these orders are so confusing That the FCC needs to weigh in a fourth time By a primary jurisdiction referral If I were counseling a competitor. I'd counsel them to start charging. Because if you don't charge, You can't collect at the end of the day. You can charge, they can dispute, And maybe, okay, fine, So we end up in the same position we were in. But if you don't charge, You can't, at the end of the day, collect. And it does take the FCC a long time To rule on this bill. So I do think, despite the new regime, And despite the caps, You could see a significant change In the way the industry is operating. And I also think it's actually quite important to note That the industry shares, for instance, View on this overwhelmingly. And that these are companies That the FCC has long recognized Have market power, And so have the incentive and the ability To charge as much as they possibly can For this service. And yet, overwhelmingly, They're not doing what Paytech is doing. Whether they have composite rates Or whether they build on individual rate elements. If the court has any other questions On the issue of the rule, There are some other issues Involving section 2043 And on the rule passed. No, no, you're on our time. Yeah, and I didn't mean to preempt My colleague's questions on this. Why don't you run through Specifically What Judge Dowsell did And why he was wrong, at least in part. Okay. So the judge found, So there's a period of time From August of 2006 to November of 2008 When there's a provision in Paytech's tariff That says, notwithstanding Any other provision of the tariff, All rates shall equal the maximum permitted Under 47 CFR 6126, The benchmark rule. And Judge Dowsell held, As we believe him, that that provision Defines the rate they're going to charge. And they charge more than that. He said only with respect To the direct traffic we think That that whole thing would apply equally If he's wrong, as we think he is, About the indirectly routed cost. Then it gets unclear. Because his orders talk about Section 2043, the deemed lawful provision As providing Paytech with a defense To refunds. And refunds have a special meaning in federal law. Refund means, my tariff said $10, I charged you $10, But it turns out, after the fact, That the agency finds that the right rate Should have been $7. That's a refund. Judge Dowsell found that we had overcharged claims. It's a defined term in federal law, 47 U.S.C. 415G. And an overcharge is, Your tariff said $5, but you charged $7. We get back the difference. And so, because he kept talking About Section 2043 and refunds, I think it's open to this court To find that he didn't make the mistake That Paytech is urging. That deemed lawful provides a defense To a breach of tariff claim. Because it doesn't. Because it's an overcharge? But your overcharge is based upon this one sentence, This, it seems to me, Almost a boilerplate statement, You know, I put in a tariff That in no time are we going to exceed. Tariffs are construed Strictly and against the drafter According to their ordinary meaning. But there may be consistency Within the tariff, because at one point The sentence says this, and then The tariff, what it's made up, Exceeds that. This is just why I think they might have put this in. I don't think they actually did this in practice. But incumbents file tariff amendments. They have to file them annually. And sometimes they file them more often than that. And because the benchmark is just The sum of the rates in somebody else's tariff, If you're a competitor and you're trying to charge Right at the top of that scale, You've got to keep on top Of what all of these incumbents are doing. Every time they amend their tariffs, You're going to have to amend yours. You know, they raise their rates, they drop their rates, Your rates are going to have to move. And I think what the purpose of this provision might have been was To make that easier for paytax. Now, I don't think they did that as a practical matter. In fact, they didn't update their rates all that often. But it's You know, and so that, I think, is why that provision May well be. We did argue in the district court That exactly what you said. That when you have two provisions in a tariff Pointing in opposite directions, We can give you a very good argument that that should invalidate the tariff. Judge Arnold said no. He said maybe the FCC could do that, but I'm not that. And I understand that, but we didn't challenge it On appeal. But now you're left with a tariff that has an unambiguous Term, and I believe it's ambiguous, Because it's construed against the drafter. That says, notwithstanding, All rates shall be this. And the only thing that can be notwithstanding Is the rate attachment. There's nothing else That that notwithstanding provision Could be trying to sweep away. So we think Judge Hassell quite correctly found that they breached their tariff For that period. And as the Beehive case holds for the district court In Utah, and as the FCC held With Farmer's case, You have to follow your tariff Even when it's lawful. You can't breach it and say, Well, my tariff was lawful, and that's great. But that means following. So to the extent Judge Hassell Can be read to have held That Dean Wofford provides a defense to a breach of tariff I think he is just wrong. And he should be reversed. But I do think it's open for this court to read and not to have made that mistake. Because he does talk persistently About to avoid Doing the defense. To read on this, and it is. We agree that it is. The next thing Richard got right Is this question of whether the tariff From December 2008 onward Was deemed lawful. And there I think it's quite simple. They didn't make a mistake. Through their own negligence, their tariff got to the FCC On December 10th. But that provision Doesn't nullify Something that doesn't get there Within 15 days. It just says When it takes effect In order to Be deemed lawful, and it gives a time period Within which the FCC can take action. That's not how the FCC Has interpreted it, John. The FCC has held And this is the streamlined tariff order we cite That you have to file your tariff Exactly on 15 days notice In order to get the benefit. And then they have rules that define When the notice period stops and ends. The notice period starts when the FCC receives it And it ends on the date the paycheck Puts on its tariff. That's 61.23. That's a regulation. It is a regulation, but the FCC Under Chevron gets the deference to implement The statute. And the FCC has held When somebody files something on 16 days notice And you think the more notice would be better Than less notice, the FCC Doesn't know. 15 days is the rule. Because deemed lawful is incredibly powerful In medicine. Well it is, but isn't the point of deemed lawful That there is a defined time within which the FCC Can take action, and it is that 15 days. We can't give it to them. The tariff took effect Because the FCC doesn't issue an order saying This tariff is now effective. Tariffs take effect on the day The filer writes on the tariff. That's when they take effect Of their own force. No FCC action is necessary for that. So when the paycheck broke down, December 24, 2008 On that tariff, that's when it actually took effect. Well, even assuming Well, maybe not. There certainly is a Disputed issue of fact As to when it was set. But when it's received Is what matters under the rules. There's no disputed issue of fact as to that. It's the 10th. Paycheck's own filing with the FedEx receipt Shows it was delivered by FedEx on the 10th To the correct address for overnight mailing. The date stamp on the certified copy Of the pleading we obtained In the FCC shows that it was received On the 10th. There's no dispute. Nobody claims that they actually Had it in their hands and could read it. And other interested parties Could read it on the 9th. It got there on the 10th. Paycheck broke the 24th. And had they been paying attention at the time They could have fixed this. Carriers that get the Dean Waffle process wrong All the time withdraw a tariff filing Before it takes effect And refile. And get it right. And had they done that here They could have corrected their mistake. But they didn't. The correct address to send to is not a secret. They could have hand-delivered it. They could have sent it to the correct address. This is a problem entirely of their own making. And yes, it seems like Hyper-technical. But the tariff regime generally And Dean Waffle in particular Is an incredibly hyper-technical area. You file a tariff. You're bound strictly to it. Your customers are bound strictly to it. And if it's Dean Waffle It means that even if your rate is unreasonable And these tariffs are long and often difficult For the FCC to get through in 15 days You as a customer start paying These unreasonable rates. And so it's not at all surprising that the FCC said If you want this incredible benefit You have to comply strictly With the time limits. And then the final issue, and this is the only thing The judge will go about wrong Is There's a short period of time where Paytech did meet the 15-day window They filed their tariff correctly And they filed it. But they charged us rates that had two switching rates in them. And under what is known as mandatory de-tariffing That tariff Never should have been filed. But doesn't that mean the FCC Could de-tariff it? But we're not asking for it to be de-tariffed. We're not asking for the tariff to be invalidated. All we're saying is That Paytech, having flouted that rule Can't be immunized From refund claims. So Paytech says Okay fine, maybe we file the tariff when it's supposed to file But it went through on 15 days The FCC didn't notice. And so therefore, even if our rates are too high It doesn't matter, you still have to pay them. But where in the regulations Is that the ramification of Mandatory de-tariffing? Well the FCC says in the AT&T order And it repeats it in the AT&T order. The reason they quote mandatory de-tariffing Is so that it restricts the counter's ability To rely on the default provision. And it restricts it because Once the FCC says And this follows logically too Once the FCC says don't file this tariff If you do The notion that you should have A legally binding, unchangeable In retrospective tariff Really undermines The strength of the FCC's prohibition. And we do think the AT&T order Is squarely on point And to the extent that the district court and PICA Try to distinguish it by pointing to the Alaska Anchorage order Nothing in the Anchorage order Suggests that had Anchorage Filed rates that were above the benchmark That they would get the benefit of de-tariffing. It just says that they're not going to be Categorically precluded From getting that benefit. And I think there's certainly an assumption there That Anchorage was going to actually comply With the conditions the FCC had imposed on them. So the AT&T order gets deference Again from this court And it should have been followed by the district court. If there are no further questions, I'm happy to stand down. Anything else? Thank you very much, Mr. Ensch. Mr. Goldstein. Thank you. Good morning, your honors. On your orders, may I please the court My name is Darren Goldstein I'm with Fergus Lastigate in Cherrydale And I'm representing the cross appellate. And you're going to say Disregard everything you just heard. Well, pretty much. We actually agree on a couple of things. We agree the FCC is earning substantial deference I think we disagree about what the FCC has done And what it said, but we agree on that. I'm more familiar with Actually one area If I recall, you both agree Is how clear The commission has been In asking that And I'm going to start there I do need to ask one thing I know that routinely the court does not Grant rebuttal time to cross appellates But the issues are somewhat Unusual and complicated And I would ask the court if something arises And even if it arises afterwards Would I be given the opportunity to respond? We'll do that. Thank you, your honor. I would like to start with the point you just made, Judge Smith. The FCC What is clear is that the FCC Did not think its rulings were inconsistent. The FCC Decided the Quest petition And New South just paragraphs Apart in the 8th report. And later in the 8th report In paragraph 75 The FCC actually recites both rulings Without ever indicating They see that the FCC saw anything inconsistent About them. They did that again In paragraphs 117 through 119 Of the 8th report. So we are arguing about what the FCC Did, but this isn't a situation where the FCC On several occasions made several rulings. The FCC issued those two Determinations and the FCC Thought they were consistent. So I'd like to start, of course, with Quest. With the Quest determination. Quest is exactly on point. And I'll talk about that in a moment. But the only argument that Verizon Has raised for why Quest Doesn't control this case Is that it is limited to the transition period. And I think that's just wrong. The Quest determination Says point blank And Verizon concedes this at page 43 Of their brief, and they conceded it below As we point out in our brief That if Quest applies, if Quest, Verizon says Is not limited to the transition period Then it covers this situation. Quest says that a CLEC Such as PICTEC can recover The full benchmark rate Including the Working into that rate, the cost for tandem switching Even if the CLEC Uses an IMAC tandem switch. No doubt about what it says. NewSouth, on the other hand Does not say precisely The contrary. NewSouth says something different, and it's talking About rates, and I'll come back to that in just a moment Because I want to deal with this transition issue. The only reason that Verizon Says Quest doesn't control Is that Verizon says Quest is limited to the transition period. And as your other, Judge Smith, pointed out That's just inconsistent with paragraph 19. Paragraph 19 says Twice that The ruling on Quest Applies equally to the transition Period and the post-transition Period. It says it in the sentence Your other pointed out, it says it in the prior sentence as well. It says it Flatly and clearly. What's more, Verizon's argument Is that even though Verizon concedes that Quest asked For a ruling that applied post-transition The argument Verizon makes Is that the FCC, for some reason And it's an unexplained reason Decided to limit Quest to the transition period. Well, first of all The FCC doesn't say that, and the FCC In numerous places in the eighth report And we talk about them in our brief Recites that Quest holding never says It's limited to the transition period. Including the chairman's statement where he very clearly Says that that In fact applies prospectively. What's more, there's no reason For Quest to apply only to the transition Period. As Mr. Angstreich pointed out The benchmark during the transition Period was a set amount. It wasn't keyed To the IMAP rates. Quest is Far more on point with The post-transition period when you're trying To determine which of the IMAP rates Can be incorporated into a CLEX composite rate. That's what Quest Is talking about. It's talking primarily About an issue that affects The post-transition period. So the point there I want to make is that Quest is right on point And it is not limited to the transition period. From there we get to New South. New South And then Cox in 2008. Ask the FCC a different question. Quest is dealing With the full benchmark rate, the single Composite rate. You may recall in the seventh report The FCC permitted CLEX. They were very clear. The FCC said we're going to let CLEX Build differently than ILEX. The FCC said we're going to let CLEX Build based on market-based Considerations. We're not going to Build on cost. We're not going to build on particular Equipment that they use. And the reason For that was that The FCC said We don't want to limit CLEX To the old technologies, the old structures So we're going to evaluate The function delivered and we're going To make the pricing fair so that CLEX and ILEX can compete for local Customers. That's what the FCC Tried to do. In New South, what happened is That CLEX came along and said Well, wait a second. If you can build a composite Rate that includes The equivalent of all these charges What if you want to choose What if you as a CLEX take advantage Of the opportunity Of the FCC's offer of Flexibility and choose instead to only Go through either the burden or the Issues that arise by trying To construct a composite rate. Suppose you Want to use the same equipment ILEX used And build the same way, element by element. New South comes along and says Well, can't we just build it for Tandem even if we don't have one? On a per service basis. And the FCC, I think not surprisingly, said Well, no, you can't do that. I mean, if you're Going to build based on function Then you can build for all the elements. And there's no doubt that's what they said. And that's what the regulations Say In section A3, that's what the Paragraph 55 Didn't New South's Petition State pretty clearly that If New South Was charging an aggregated An aggregate switched access charge And not charging a Tandem rate? I didn't mean to No, quite the opposite. What the Appendix if you'd like It's most clear If you read through the telecommunications Part of this whole thing But if you look at the diagram That New South submitted You'll see that there are references To charges for different MOUs Which are minutes of use And what the diagram is showing Is that New South has separate element Charges and perhaps I think it's page 286 Or 9 I think it's 289 Yes, it's 289 If you'll see there's a little key at the bottom Left and there you see It's indicating separate charges For each of the separate elements It's very clearly not a composite rate And in fact if you read the letter What the letter New South submitted Is saying And that is at page 286 Of the appendix It says It says that the Senate report Requires that it be permitted to charge All access elements including They're asking to be Allowed to charge the individual elements And what they're really saying If you read through their letter Is if you can do this in a composite Why can't we do it with our individual elements That's what's really happening And they were not New South itself was not submitting An aggregate charge So coming back To why the FCC Did not think That it's rulings on the Quest petition And on New South were inconsistent It's because Quest very clearly Deals with the full benchmark single rate That can be charged It's right on point It deals with charging for an ilex tandem New South and Cox All the language that addresses the rate Is very specifically limited to a switching rate Not a composite rate You never see the word full benchmark rate You never see any reference to the composite They're always talking about how do I charge A particular element Cox comes along in 2008 Very much the same thing Cox comes along, says we build Element by element And we recognize what was said in New South And Cox essentially says How about if we build more switches How about if we just build a tandem switch Then can we charge for it And what the FCC says to Cox is Well we're going to charge your switches Based on what they do You can't say with one switch If you're going to charge element by element You can't charge separately But the FCC The issue Cox at the FCC Was concerned about was whether or not They were being encouraged to build Unnecessary switches And that's what Cox dealt with Cox said you'll be allowed to charge Again only if you're charging element by element Cox does not address a composite rate At all, doesn't talk about the full benchmark rate Cox merely says That if you're going to charge individually For switches We're going to look at what those switches do To see which individual rate That switch lines up with That's what Cox is saying And then Cox says as your author pointed out If you If an IFC chooses They can hook up directly and eliminate the tandem charge The concern was with Building switches and eliminating The charge that's going to be eliminated there Is the Ilex tandem charge That's what's going to be eliminated for sure Because the Ilex will come out of the picture Could I just hear your discussion About New South again Because I'm having trouble following Yes of course If we look at the New South And it's paragraph 20 primarily Let me Just turn to that myself I Thought That the FCC Rejected New South's position That's correct And what they said Is that If an incumbent Ilex switch I'm looking at it, it's actually paragraph 21 If an incumbent Ilex switch Is capable of performing Tandem and end office functions Here's the key The applicable switching rate Should reflect only the functions provided And then it goes on to talk about Which rate, which switching rate applies That applies to a SELEC Like New South That is charging individual switching rates Rather than a single composite rate For access service See what went on here today We actually back up for a second In the seventh report The FCC said we're going to give SELECs a choice You can build like Ilex if you want to Or you can build one single charge For access service Because that is the same function In the eighth report It's the same function When you connect a long distance carrier To an end user customer That function is the same Whether you do it in the old Tandem switch to end office fashion Or in some other fashion You're providing that same access And what New South is saying is If you take the first route If you choose to build like an Ilex Then you see that has to build Particular rates that match up to their Particular pieces of equipment Was the purpose Of the seventh report To bring SELEC charges In line with Ilex charges You know there were several purposes For the seventh report One purpose And clearly it was a significant purpose And Verizon and AT&T Have talked about this In the briefs It's just another irrelevant purpose One of the purposes was that before 2001 SELECs were essentially unregulated So one concern And this goes all through the seventh report The FCC wanted to get some control Over what SELECs were charging Clearly that was a purpose That's been accomplished Rates are now 10% of what they used to be Or less What the FCC did was to institute the benchmark And that really did that problem And that took care of this problem With SELECs not being regulated And being able to act as Having all the leverage over IXCs But did the commission want to bring A certain parity To the use of SELECs Exactly, what the FCC wanted to do Is in paragraph 48 They basically said In 48 of the seventh report The FCC said We want SELECs to be able to charge Revenue that would be equivalent To what BILACs charge And then again in paragraph 54 They were even more specific They said that this revenue Assists your ability to compete For local customers And we have the IXCs essentially over a barrel They have to pay for access So we want to make sure that that revenue That comes into your local company That you can use to benefit your competition We want to make sure it's equal This question may sound overly simplistic To you then, but How does allowing A SELEC to charge For a service it does not Provide Square with the purpose That I understood The seventh report had In mind, and that was this kind of parity No, no, that seems to me they're at odds It's not really Of course it's a simplistic question You already asked one But the answer is Don't overestimate No, no, no, we have The last argument We have a lot of confidence in this bench No one gets asked for primary jurisdiction referral We have a lot of confidence in the bench To decide on these issues The issue becomes What the revenue is going to be That these companies can recover The ILACs are the  Monopoly providers They built the networks They set up the networks with the switches The switches in the old days Required a tandem switch That branched out To end office switches that branched out to customers Because back in the old days The ILACs, what are now the ILACs Provided comprehensive coverage They were the only show in town When SELECs came along to compete They're finding themselves in a position Where they have to use Especially in the beginning The ILAC tandem switches To connect their calls They're being limited In what they can recover for the service they're providing And many of them are not doing it In the old way that the ILACs did Paytech, for example Doesn't target comprehensive coverage Paytech targets business customers Spread out in different places And Paytech sets up a network That doesn't branch out From switch to other switches to customers Paytech, as a competing Lab degree Sets up a network That branches out in all directions And uses its switches at high bandwidth And takes different calls Just like the FCC was talking about And it delivers the same function It delivers access To the long distance carrier To its customers But it does it in a different way And then what the FCC is saying If we limited you to recovery Based on a particular piece of equipment you used We'd do two things that we don't want to do Number one, we'd forever freeze in time The equipment and structures I mean, the very thing that was Sought to be accomplished by now In competition was to allow new approaches So number one, we'd freeze in time The old pieces of equipment Because that's all we'd pay for And number two, CLFs can never catch up They never have the same Number of elements and switches So that they'd recover their costs I'm sorry, they'd recover the same revenues But in the indirect situation It's not Paytech's switch It's the ILEX switch And Verizon is paying twice For the use of that switch, is it not? Well, Verizon pays more There's no question about it But here's the key point The FCC rules are not about What you charge IXCs Because all the IXCs have been charged the same Whether it's Verizon or Sprint or AT&T Who's weighed in Competitively, they're in the same place They're either paying for tandems And paying for CLFs or they're not The issue is, how does a CLF Like Paytech Compete against other ILECs Who are associated with AT&T or Verizon But are local companies How does Paytech compete with them for local customers? The tandem isn't a cost to it, though Right, but that's the point The FCC made clear In paragraph 57 The eighth report That this is not cost-based regulation This is market-based This is about equalizing Access to access-charged revenues It's not about cost for the CLFs Maybe I'm misunderstanding Your position As just now stated Or a point I thought Mr. Angus Made earlier And that was In answer To your statement That all the long-distance carriers Are paying the same amount I thought I understood him To say essentially that Paytech Was out of style Paytech's Charging for These services Was not consistent with what The majority practice is Among the CLFs I'd like to actually jump to that That touches on the Is that your understanding of what he said? That is what he said And I take issue with it For a number of reasons It was the question your honors raised In response to AT&T's amicus Submission That's where that fact came from And the court In its letter to counsel Asked that question And the follow-up question Shouldn't we consider primary jurisdiction referral If this might affect the industry I'd like to start with that This frightening Idea that the industry Is going to somehow be turned on its head It's really just that It's just an idea There's no reality to this Jeff Stelzner's opinion was issued in April of 2010 It's now 20 months ago There's been no people in this industry There's been no outcry There's been no industry publications Complaining about it There's been no change There's been no Nothing bad has happened As a result of his ruling Secondly, as your honor pointed out The FCC just issued a once in a Decade at least New order addressing Access charges 700 pages, addressing access charges Was issued last November, 19 months After Jeff Stelzner's opinion Addressing access charges The very thing addressed by Jeff Stelzner Nothing in that order Limits or even Criticizes Jeff Stelzner's ruling And if ever there was an opportunity For the FCC to say Wait a second, a district court judge got this wrong And this is going to change the industry It wouldn't have been in that order Doesn't happen at all In Sprint v. Northern Valley Cited in our briefs In July of 2011 The FCC In that case That deals with some other issues Paragraph 5 of Sprint v. Northern Valley The case is cited on page 62 of our brief The FCC, again Restated its eighth report decision Which says that you can recover The full benchmark rate As long as you serve and use your customers So rather than walk away from that ruling Or decide on something wrong with it The FCC restated it as recently as six months ago And when it issued This landmark 700 page order Never criticized the ruling As to the fact itself Let me point out It appears only in AT&T's Weakest submission There is nothing in the record to support that Nothing at all It's never been subject to cross-examination I'll get to a moment when it's legally relevant anyway But leaving that aside In response to your letter AT&T writes a letter back That says something like Well it's really hard to tell what people charge for But here's what we think And Verizon wrote back to the court and said We've done some kind of analysis And we've determined now I guess we think we can figure out Who charges for this and who doesn't And they come up with 11% Of CMEX charges And they include affiliates That's not a fact that this court Ought to be reliant on It's clear that decisions Should be made based on facts in the record For good reason because they're subject to cross-examination And the bigger point perhaps Is it's not legally relevant anyway What other CMEX are doing or not doing Or understand about their rights What's important is what the FCC said And that I've discussed I think they've been right on point Any other matters you'd like to deal with? What about on the first Yeah I know What about You're on our time There's obviously a dispute On the Dean Lawful issue Dean Lawful You know a couple of things Dean Lawful is peculiar To the telecommunications industry It's in 20483 Perhaps Working backwards a bit The statute is very clear It says shall be Dean Lawful But filed a certain way 15 days later That's what the statute says So number one the statute is controlling I think Judge Rondella You suggested of course a regulation Can't undo a statute and that's of course correct But what's more here The FCC hasn't even issued anything I believe it's inconsistent The rule is a streamlined tariff order Which I referred to That decision relies on Fighters who sought To get a Dean Lawful tariff Effective on 16 days Or 17 days notice in each of those two cases That's very different than what happened here The statute says shall be effective 15 days So the FCC I think is actually correct to say You can't choose for your own purpose A 16th day or a 17th day The rule says 15 days In our case We can talk about what happened The mailing and non-mailing But essentially the court of law said It was received on 14 days Well 14 days isn't trying to get a greater benefit than 15 days So I think the statute is right on point The FCC couldn't change it anyway And I don't think it has What's the magic of the Putting of the effective date On it when it's filed What they should do is Walk it in And when you're there Count and write it in But what's the magic once you misstate The effective date It clearly is The date that was intended to be the effective date Why that's done I don't know But the effective date here clearly wasn't The 24th That's exactly right And why that's done I know the mailing was difficult I mean we refer to it in our case But it's not all that clear where these things are supposed to go There's the address to which Paytech Sent its filing Is the address for Tower Filings But then there's a separate provision that says Postal service Overnights go one place And Federal Express Overnights go another place And it looks from the factual record Like this one was sent at least under one reading Of all that To D.C. Militia or Dr. Maryland But yes It was sent with the intention That it would be a December 24th effective date Turns out to be December 25th Would the effective date as a matter of law Be the 25th Yes That's mandatory I'm sorry that's the 15 day rule On mandatory tariff I'll just say this The ACS case which is discussed There's actually two ACS cases It's the 2007 ACS forbearance case That case is right on point That case is right on point It deals with the benchmark It came up oddly in the context of an IREC That was subject to the CLEC benchmark That's the only bit of confusion But the other It was absolutely clear The case says that Deemed lawful is that rates Filed that seek to comply With the benchmark Will be deemed lawful even if they exceed the benchmark That's the gist of that case There's no doubt about it The cases that Verizon was on Are cases where the entire service is detached And that's the AT&T case And some of the others That's very different When the FCC says you can't tariff a service at all And in those cases it dealt with some broadband services In AT&T If you can't tariff broadband at all And you file a tariff for broadband Well we're not going to be deemed lawful If we went out and tried to tariff a service Well we have here We're dealing with a rate It's very unusual De-tariffing of a particular rate Where it's above the benchmark Where the benchmark is not at all clear It's why we're here, it's why we're there It's why we're here And that's exactly what deemed lawfulness deals with And that's what ACS says It says that there, because we need certainty And it's the early ACS case, the 2002 case Talks about the certainty provided by deemed lawfulness There Now, you won't get deemed lawful protection Because there has to be some certainty about rates And what they mean And Just as an aside The real purpose for the de-tariffing of the rates Was to encourage more contracting Verizon points out that Ever since 1997 In the United Kingdom There was an ability for CELEX to contract Rates outside the tariff system But there That's where we were before there was any Regulation of CELEX at all What went into our de-tariffing When we signed our brief that the order says What it sought to encourage Was actual contracting for higher rates And that's sort of the background If it's of any interest That's how that happened The only other issue is the notwithstanding language And very quickly If you're on us at some point Look at pages 393 to 398 Of the appendix You'll see what a schedule of rates looks like It's very specific In that case it's six pages Of rates for particular areas A sentence that says Notwithstanding Our rate would be the maximum benchmark rate Cannot establish a rate Verizon would not stand here and say If they saw a tariff like that They'd pay a rate That doesn't set a rate It was an attempt To state the law And acknowledge the benchmark But it does not undo the lawfulness I mean the fact of the matter Is the rate everybody here in this case And this is in the factual record Verizon always knew that the rates were the ones on the schedule Paytech knew they were on the schedule Paytech never sought to charge a different rate Based on that sentence And just doubts out When he interprets the benchmark Says that the rates exceed the benchmark He's talking about the schedule He's not talking about that sentence Any others Other questions Telecommunications Thank you Thank you your honors I guess I'd like to start with a very simple proposition The rules establish A single benchmark or ceiling For every common area In the country There's only one in any area And that's the maximum competitors can charge And it is the sum of the applicable elements When the FCC says Certain elements are not applicable They are not saying That there are two benchmarks And that's paytech's view That if you choose to bill one way You can only charge this much But by adding up your rates Suddenly you can charge that much That's not the policy It's not consistent judgment as you know With the policy that you can only charge For the work that you do It's actually the exact opposite of it And that's the policy the FCC applied in 2008 It applied it again in 2011 And you know Paytech points to the intervening Northern Valley decision In that case Sprint conceded that Northern Valley Had complied with the benchmark And the FCC doesn't say That Doesn't say about full benchmarks It says appropriate benchmark Because the issue of Was Northern Valley exceeding the benchmark Wasn't the issue in that case So since 2004 the FCC has repeatedly said We have a rule And our rule is charged for what you do And paytech is charging For what it is not doing Paytech isn't even claiming the right In the direct connection context When it only provides a split That's all it does There's only one rate element it could possibly charge That it can suddenly call that one rate element A composite rate And add in nine other rate elements to it And that's the exact opposite Of the policy that the FCC adopted The seventh report, Judge Smith You were absolutely right It was designed to stop competitors From subsidizing their competition With incumbents By charging long distance carriers And that's what paytech is doing By charging extra to Verizon businesses Giving extra revenue not available to the incumbents So fostering That's less certainly than in 2001 When the rates were outrageous But it's still doing the opposite of what the FCC Intended to do Which was to put competition between incumbents And competitors on a level playing field By not letting competitors Shift their costs To the long distance carriers If they want to recover more they can recover from their own customers The people who actually buy telephone service And then pick up the phone And place and receive calls On the issue of the 14 days, your honor The magic of the effective date That's when the tariff goes into effect If this court were to hold that a tariff Goes into effect on the date Other than the one written on the tariff It would be a radical change in the law No court has ever held that The FCC has never held that The FCC compels buyers to put a date on that tariff So the world knows the date the tariff Goes into effect And this notion that the real date is the 25th Never raised until this appeal Completely waived, even aside from the fact that it's wrong The streamlined tariff order Was not an order about 16 days, 14 days That was the FCC's order Implementing the new statutory provision That's the one where they made clear That you have to file on 15 days notice Not you have to file And then 15 days later it will take effect But on 15 days notice And your honor, see my time has expired Anything, we'll give you a couple minutes If there's anything else you want to say I guess the last point to go to On the primary jurisdiction And I recognize that this court has the option of A primary jurisdiction referral action For an amicus brief I do think that the business edge case and the CSX cases Are very similar to this Where the court was confronted with a district court That made a regulatory interpretation This court found that it got it wrong It found that perhaps the views of the agency would be helpful But they're not essential here Paragraph 19 and 20 and the subsequent orders I think direct the court as to what the FCC believes Is the proper interpretation For the agency But wouldn't it be helpful If you believe that you have the FCC's view That you're correct to have them Come back on your side So that we don't Make a mistake at all It might well be helpful And I certainly wouldn't tell you You obviously have the authority to ask for it I guess the one thing I'd suggest Is if this court were to issue a primary jurisdiction rule And recognize that it would be telling judge That something got it wrong And the judgment would have to be vacated Pending the outcome of the FCC's An amicus brief wouldn't have that effect An amicus brief would not have that effect I would ask though that both sides be given a short You guys would put in an order If you do request one That the order requesting would also include a time frame For responsive briefs by the parties We're going to ask for one anyway So if you set it up in advance It's helpful And the effect of doing that Would be to To give a great deal of deference To the FCC's Certainly to talk about our case Which is going on Saturday The FCC does get quite a bit of Deference to those amicus briefs I think the thing to collect here Is that the FCC would be interpreting words on paper This is not a question of Policies, this is a question of When they wrote those things So it would clarify What they meant by certain words I think they could It's sort of always a bit strange to me To see a commission in 2011 Which is made up of different people at the commissioner level The general counsel level, the staff level Telling you what a different set of people Had in their heads when they wrote These words down So I think you do need to be Bounded to some extent by What the words on the paper are The FCC certainly doesn't have the power to change its regulations Through an interpretation And here Although they may have to enforce What the written word So their view of what it means They do, but the difference there of course Is that we can't appeal an amicus brief We could If there's an enforcement case Or even a primary jurisdiction case We do get the right of appeal The FCC is subject to the substantial evidence documents There are factual issues, it's subject to Arbitrary purchase review And in experience That's a, you know, it's not the most Searching, it's not the noble review But that's a more searching kind of review Than the Standard that applies to Amicus briefs So there is a difference in that sense In terms of how the whole Legal process works It's a problem with amicus briefs Although I recognize that from a timing perspective It's far preferable to go that route Than the primary jurisdiction route Thank you very much Mr. Einstein Mr. Goldstein, anything you want to say Just very briefly Thank you A gesture I was responding to Just the latest points Paytech does not say there are two separate benchmarks The benchmark is keyed To the ILAC's rate Competing rate If we have a composite charge For access service as a whole Then the competing rate is access service as a whole If you're charging element by element Piece of equipment by piece of equipment Then the competing ILAC rate And therefore the benchmark is piece of equipment by piece of equipment And we're not arguing there are two different benchmarks They're just As the FCC made very clear It was afforded two different ways To describe your charges I'd like to just say this On the primary jurisdiction referral Or hopefully The amicus brief Rather than that The only point is this These litigations are difficult And essentially my client's money Has been over for a long time My only concern with the Primary jurisdiction referral Is as described in the letters that can take a fair long time And certainly I would not think there would be any Basis for vacating anything While that happened but I'm hoping that doesn't happen anyway Because then it's a long delay And more money In terms of the amicus brief Again I would only Put some time limit Because I don't know If the FCC made a Determined they're not interested enough to file I don't want the case to be waited This is a state law Diversity action I know It's a federal Okay Then I had Basically Misunderstanding something here Because my question was going to be Given that your client's money is at stake Are you not entitled To move interest eventually I suppose but this is A long time and the numbers are getting bigger and bigger We have as you know Rule 54B judgment but it's been Bonded And we're waiting When the day finally comes It's interesting That each of you would Welcome an amicus brief confident That each of you is correct Well I would say this And I know that this may be Stretches this a bit I did not talk about Actually a key part of our Argument which is that Verizon We're going to do a lot of very important Distinctions Because they're all The other thing is this whole distinction Based on whether your end user is served That runs throughout And it's still a long There's a big difference If your old end user Customer serves Then you get a charge But the regulation 61.26F Says do not sell You have to bill just like Mr. Ekstrak says If you're an intermediate card Which we're not here You mentioned in the letter I would be interested In the FCC's thoughts on How That distinction plays out Given its determination Thank you very much This case was extremely well argued Excellent briefs We would like to have a transcript made Of the oral argument And have you share the cost of it And we will take the matter Under advice Thank you